**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF GEORGIA**
**ALBANY DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| PAUL O. FARR, | ) | CHAPTER 13 |
| | ) | CASE NO: 10-11904 |
|     Debtor, | ) | |
| _____ | ) | |
| GEOFFREY CRISLER, | ) | JUDGE JAMES D. WALKER, JR. |
| CHRISTOPHER CRISLER, and | ) | |
| TIMOTHY SCOTT CRISLER, | ) | |
| | ) | |
|     Plaintiff, | ) | ADVERSARY PROCEEDING |
| v. | ) | |
| | ) | NO.:_____ |
| PAUL O. FARR, | ) | |
| | ) | |
|     Defendant. | ) | CORE PROCEEDING |
| _____ | ) | |

## COMPLAINT TO DETERMINE NONDISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523(a)

COME NOW PLAINTIFFS GEOFFREY CRISLER, CHRISTOPHER

CRISLER, and TIMOTHY SCOTT CRISLER, by and through counsel, and file

this Complaint for to Determine Nondischargeability of Debt Pursuant to 11

U.S.C. §523(a), showing the Court as follows:

1.     This is a core proceeding over which this Court has jurisdiction under

28 U.S.C. §157(b).

2.     Defendant Farr is a resident of the State of Georgia and is the debtor

in this Chapter 13 case.

434778.1

- 1 -

3.     Plaintiffs are creditors of Defendant Farr.

4.     This is an adversary proceeding to determine the dischargeability of debt.

5.     Defendant Farr is indebted to Plaintiffs in the amount of at least $550,000, plus interest, general damages, and punitive damages.

6.     This Court has subject matter jurisdiction over this Complaint based upon 11 U.S.C. §523(a).

PROCEDURAL BACKGROUND

7.     On January 12, 2010, Plaintiffs filed a complaint for damages against Debtor and his former law firm and law partners (hereinafter "Co-defendants") in the Superior Court of Sumter County, asserting claims of legal malpractice, breach of fiduciary duty, and fraud, which case is designated Civil Action No. 10CV-17SZ.   Plaintiffs' claims arise out of Debtor's representation of Plaintiffs in connection with the death of their mother in a hit and run collision in Albany, Georgia in 2004.

8.     On October 29, 2010, Debtor filed the instant Chapter 13 Bankruptcy Case.

9.     Plaintiffs filed a Motion for Relief from the Stay on December 13, 2010, seeking an order relieving them from the stay and authorizing them to proceed with their pending action against Defendant Farr in the Superior Court of

Sumter County. A true and correct copy of Plaintiffs' Complaint pending in Sumter County was attached as Exhibit "A" to Plaintiff's Motion for Relief from the Stay.

10.   On January 13, 2011, a Consent Order granting relief from the automatic stay was entered by the Court authorizing Plaintiffs to complete the state court litigation and liquidate the claims therein.

### Factual Background

11.   Ginny Crisler was killed December 14, 2004, when she was struck by a hit and run motorist as she attempted to cross the parking lot of Hunter's Mill Shopping Center in Albany, Georgia.   Ms. Crisler was survived by three sons, Timothy Scott Crisler, Geoffrey Wayne Crisler and Christopher Davis Crisler (hereinafter sometimes "Plaintiffs" or the "Crislers").   At the time of the incident, Hunter's Mill Shopping Center was owned by George C. McIntosh and Langdon S. Flowers and was managed by Walden and Kirkland, Inc.

12.   Defendant Farr and his firm were hired to probate Ginny Crisler's will and to investigate and prosecute a potential claim for the wrongful death of Ginny Crisler.

13.   On June 17, 2005, Mr. Farr emailed Scott Crisler and advised that he had received a response to a Freedom of Information Act (FOIA) request.

However, Mr. Farr never sent an FOIA request and obviously, never received the purported response. His email to Scott Crisler was not truthful.

14. On July 8, 2005 and July 22, 2005, Mr. Farr emailed Scott Crisler a purported demand letter concerning Ginny Crisler's wrongful death. The letter was a fabrication that was addressed to a fictitious person at Liberty Mutual Insurance Company. Mr. Farr had no idea who provided the liability insurance for the owners of Hunter's Mill Shopping Center. Mr. Farr provided the fabricated letter to placate Scott Crisler into believing a real demand letter had been sent. Liberty Mutual returned the letter to Mr. Farr and advised him it did not provide liability insurance for the incident. Mr. Farr did not disclose Liberty Mutual's response to Scott Crisler.

15. On August 19, 2005, Mr. Farr emailed Scott Crisler and advised that he was in telephone communications with the potential defendants' liability insurance carrier and that he was preparing a lawsuit. The contents of that email were not truthful.

16. On November 7, 2005, Mr. Farr emailed Scott Crisler and suggested that he had drafted a complaint and interrogatories. On November 13, 2005, Mr. Farr emailed Scott Crisler and advised he had received a general denial to the lawsuit. These representations were untrue. No answer had been filed because no lawsuit had been filed.

17.     On November 29, 2005, Mr. Farr forwarded to Scott Crisler a Complaint, an Answer and Plaintiff's First Interrogatories and Plaintiff's Request for Production of Documents, but all of these documents were fabricated by Mr. Farr.   On December 7, 2005, Mr. Farr emailed Scott Crisler and confirmed a specially set trial and advised of depositions.  These statements were not truthful.

18.     On January 13, 2006, Mr. Farr emailed Scott Crisler and advised that depositions were starting in one week. This representation was not truthful.   On January 19, 2006, Mr. Farr emailed Scott Crisler and advised that the scheduled depositions had been cancelled because the insurance company lawyer had an unexpected death in the family.  In fact, there was no lawsuit, no depositions, no defense lawyer and there was no death in the family.

19.     On February 23, 2006, Mr. Farr emailed Scott Crisler and advised that the depositions had gone well and gave plaintiffs an opportunity for summary judgment as to liability.  On February 24, 2006, Mr. Farr emailed Scott Crisler and advised that trial was scheduled for March 27, which was untrue since no lawsuit had been filed.

20.     On April 25, 2006, Mr. Farr advised Scott Crisler that the court had granted summary judgment as to liability in favor of the plaintiffs.  On April 26, 2006, Mr. Farr emailed Scott Crisler and advised of the appeals process for the partial summary judgment, which never occurred.

21.  On July 20, 2006, Mr. Farr sent a series of emails to Scott Crisler advising of impending mediation; however, there was no scheduled mediation because there was no lawsuit pending.

22.  On September 11, 2006, Mr. Farr called Scott Crisler and advised that the Crislers had been offered policy limits to settle the claim.  Because Scott Crisler understood that was two million dollars from two different insurance carriers, he asked and Mr. Farr confirmed it was two million dollars.  Scott Crisler was surprised that the insurance companies had started at the top, but Mr. Farr told him that because of hurricane Katrina and some other things the insurance companies didn't want to fight.  Scott Crisler was relieved and accepted what Mr. Farr knew to be a fictitious settlement offer.

23.  On September 20, 2006, Mr. Farr emailed Scott Crisler and advised that settlement documents were expected the following week.  On September 29, 2006, Mr. Farr emailed Scott Crisler and advised that he had talked to the "other side" and that settlement funds would be wired and settlement documents would be sent via overnight delivery.  None of these statements were true.

24.  On October 13, 2006, Mr. Farr wrote Scott Crisler and enclosed a liability Release of All Claims.  The Release sent to Scott Crisler purported to release George C. McIntosh and Langdon S. Flowers, Jr., from any and all claims arising from the incident occurring in Hunter's Mill Shopping Center that resulted

- 6 -

in the death of Ginny Crisler.   Scott Crisler, as Executor of the Estate of Ginny Crisler, signed the Release of All Claims on October 19, 2006.

25.   On November 7, 2006, Scott Crisler forwarded wiring instructions to Mr. Farr for the settlement proceeds.   On November 15, 2006, Scott Crisler received a fabricated document from Mr. Farr, which Farr had created using the letterhead of Central Bank, that blamed the wiring delay on Federal Homeland Security Law.

26.   On November 15, 2006, in an email to Scott Crisler, Mr. Farr advised that the wire would be funded on Friday.

27.   On November 17, 2006, in an email to Scott Crisler Mr. Farr advised that the total wire would be $702,427.35.   This was the first time Mr. Farr had discussed disbursement numbers with Scott Crisler.   Scott Crisler told Mr. Farr that Scott believed the whole time that the gross settlement was two million dollars. Mr. Crisler asked Mr. Farr to forward both of the insurance policies.   Mr. Farr then advised Scott Crisler that he had "screwed up" and had only settled with one insurer for one million dollars, but because of the misunderstanding, there would be no attorney fees deducted from the first one million dollar settlement and Mr. Farr would aggressively pursue the second million.   Because of the "screw up", Mr. Farr agreed to reduce the Firm's fee by 10%, pay interest because of the delay and defer the Firm's fee until recovery against the second insurance policy

occurred. During this exchange, Mr. Farr claimed to have spoken with the insurance company, but this assertion was not truthful.

28.   On November 21, 2006, Mr. Farr forwarded to Scott Crisler a purported demand letter for the "second" one million dollars.  The letter was addressed to St. Paul Travelers Insurance Company.  It was sent to Scott Crisler to deceive him because Mr. Farr never mailed it to the insurance company.  Also on November 21, 2006, Mr. Farr emailed Scott Crisler and claimed he had spoken with the bank. Mr. Farr stated the bank was putting another 24-hour hold on the wire because of the Homeland Security Patriot Act.  This misrepresentation was another attempt to stall.

29.   Mr. Farr decided on the morning of November 22, 2006, to begin writing checks on the Firm's accounts as a vehicle to get the bank to fund the wire. Mr. Farr admitted that he was "generally" familiar with check kiting at that time.

30.   On November 22, 2006, Mr. Farr wrote check #5495 for $1,000,015.00 drawn on the Firm's trust account at SB&T and deposited it into the Firm's trust account at Citizens.   He then wrote check #9602 for $1,000,015.00 drawn on the Firm's trust account at Citizens and deposited it into the Firm's trust account at SB&T.   He then wrote check #9603 for $1,000,015.00 drawn on the Firm's account at Citizens and delivered it to Central where a Central employee

deposited it into the Firm's trust account.  Central gave the Firm immediate credit for this deposit.

31.    Mr. Farr's reason for writing these checks was to fund a wire transfer to the Crislers out of the Firm's trust account at Central. While at Central, Mr. Farr signed a Wire Transfer Form directing Central to wire a total of one million dollars to the Crislers pursuant to wiring instructions provided to Central by Mr. Farr.

32.    Central employee Janet Porch "keyed in" the wire on November 22, 2006 and then left for the day. Central received confirmation that the wire transfer had been sent in the form of an Outgoing Wire Advice.   By way of an Incoming Wire Advice, at 5:20 p.m., on November 22, Central received notice that the previously sent wire had been returned.

33.    When Ms. Porch returned to work on Friday, November 24, 2006, the day after Thanksgiving, she found that the November 22, 2006 wire transfer had failed and she advised Mr. Farr.  The wire failed because the Wire Transfer Form identified that each Crisler brother was to receive funds but there were no instructions as to how much each brother was to receive.  Thereafter, Mr. Farr gave Ms. Porch the breakdown for the three new wires as being $334,000, $333,000 and $333,000 and Ms. Porch "re-keyed it."

34.    On the morning of November 24, 2006, Mr. Farr wrote check #1206 for $1,000,045.00 drawn on the Firm's petty cash account at SB&T and deposited

it into the Firm's trust account at Citizens.   He did this because "... [he] was concerned that one of those checks he had already written was going to bounce."

35.   On November 24, 2006, SB&T vice president Ty Turner was asked by Mr. Farr if SB&T could cover a one million dollar overdraft in the Firm's petty cash account because of a family emergency or a client problem and that there was going to be an insurance check that would cover it.

36.   On November 27, 2006, Mr. Farr created a sham letter purportedly from the Zurich Ins. Co. by cutting, pasting and faxing the Zurich logo onto content he created.   The letter stated that the insurance company had mailed a settlement check to Mr. Farr in the amount of $1,000,045.   Mr. Farr telephoned Mr. Turner at SB&T and told him that he (Farr) had written an SB&T check to clients for one million dollars in anticipation of insurance money coming in to cover the check, but that had not yet occurred.   Mr. Farr asked Mr. Turner to "hold" the check. Mr. Farr faxed the fake Zurich letter to SB&T as an inducement for the bank to cover check #1206.

37.   On the evening of Monday, November 27, 2006, Mr. Farr, knowing that the wire transfers to the Crislers were successfully completed on November 24, 2006, approached his father-in-law, Richard Haugabook ("Haugabook"), asking to borrow one million dollars.  Mr. Farr told Haugabook that he (Farr) had settled a case for clients with an insurance company, had written firm trust account

checks for one million dollars to the Crislers before he had received funds from the insurance company and that there wasn't any money in the trust account to cover the checks.

38. On November 28, 2006, Haugabook met with Russ Barnes, Paul Farr and Bill NeSmith at the Firm's office. Haugabook agreed to loan Paul Farr and the Firm one million dollars relying solely upon their promises that he would be paid back. Mr. Farr, Mr. Barnes and Mr. NeSmith assured Haugabook that if he provided a loan to cover the money that Farr had disbursed to the Crislers, Haugabook would be repaid by December 8, 2006.

39. Mr. Farr cut, pasted and faxed Scott Crisler's signature from the fictitious Release of All Claims signed by Scott Crisler on October 19, 2007, to create a false life insurance release that he showed to his law partners and Haugabook at that meeting. Mr. Farr used the life insurance release to explain why the Firm wasn't going to get any attorney fees. Mr. Farr prepared a second fake Zurich letter by cutting and pasting the Zurich logo on content he created. During the meeting, Mr. Farr showed this letter to his law partners and Haugabook to explain that life insurance proceeds would be delivered by December 8, 2006. The fake letter from Zurich was an unsigned copy.

40. At some point after November 27, Mr. Barnes learned from Mr. Farr that no lawsuit had been filed by Mr. Farr on behalf of the Crislers. On December

- 11 -

8, 2006, Mr. NeSmith advised Mr. Haugabook that there had never been a suit filed, that there had never been a settlement and there was no money coming from an insurance company. Later that morning, Mr. Barnes convened a meeting with Bill NeSmith and Haugabook. Mr. Barnes laid out for Haugabook what he had learned from the documents and his various investigative conversations about how the transaction had occurred and who received funds wired from the Firm account.

41. On December 9, 2006, Barnes met with Scott Crisler and his wife at the airport in South Carolina. Barnes showed Scott Crisler a summary of the checks written by Farr and told Scott Crisler that Farr had kited checks in order to fund the Crislers' settlement. He showed Scott Crisler a copy of Haugabook's check and told Scott Crisler that the real lawsuit regarding Ginny Crisler's wrongful death had just been prepared and filed by Bill NeSmith. Barnes advised Scott Crisler that he had checked Mr. Farr's computer and that the legal pleadings Farr had earlier provided to Scott Crisler were all there, but they had been fabricated. Barnes told Scott Crisler that Mr. Haugabook was coming after him for the money and if he and his brothers planned on keeping the money they needed a lawyer.

42. The Defendant's law firm having filed a wrongful death claim arising from the death of Ginny Crisler immediately preceding the statute of limitations for such claim, that firm thereafter withdrew from representation of the Crislers

and the matter was thereafter handled by Davis & Melton, P.C. and The Webster Firm, P.C.

43.   As a result of Defendant Farr fraudulently representing his handling of the claim, Plaintiffs' recovery for the wrongful death of their mother was significantly reduced from that which would have been expected with the timely and proper pursuit of the claim by Defendant Farr and his firm

44.   On or about December 22, 2006, Richard C. Haugabook, through counsel, filed suit in the Superior Court of Athens-Clarke County against Geoffrey Crisler and Christopher Crisler, stating a complaint for a temporary restraining order, interlocutory injunction, permanent injunction, and damages.   Plaintiff Timothy Scott Crisler was submitted to the jurisdiction of the court in Athens-Clarke County and Haugabook amended his complaint to add Timothy Scott Crisler as a defendant.

45.   Following lengthy litigation with respect to Mr. Haugabook's entitlement to recover the funds that were delivered to the Crislers by Farr and the Firm, the Court of Appeals reversed the grant of summary judgment in favor of the Crislers and ordered that summary judgment be entered in favor of Richard Haugabook on the claim of money had and received.

46. Upon the remittitur from the Court of Appeals, summary judgment was entered for Richard C. Haugabook so that judgment has been entered against the Crislers.

47. The Crislers incurred significant costs and expenses associated with defending themselves in the lawsuit pursued by Richard C. Haugabook resulting from the loan procured by Farr and the Firm from Richard C. Haugabook.

48. The judgment rendered against the Crislers has caused significant damage to the Plaintiffs.

## COUNT I

### NONDISCHARGEABILITY OF DEBT BASED UPON FRAUD OR DEFALCATION WHILE ACTING IN A FIDUCIARY CAPACITY 11 U.S.C. 523(a)(4)

49. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 48 above as though fully set forth herein.

50. Plaintiffs and Defendant Farr had an ongoing attorney-client relationship.

51. Plaintiffs and Defendant Farr were in a confidential relationship, as set forth in O.C.G.A. §23-2-58, and Defendant Farr owed a fiduciary duty to Plaintiffs because of their attorney/client relationship.

52. In performing this fiduciary duty, the Defendant Farr was obligated not to pursue any interest or take any act adverse to the Plaintiffs' interests.

53.    Defendant Farr knowingly and fraudulently misrepresented to Plaintiffs that he was actively pursuing Plaintiffs' wrongful death claim, which arose from the death of their mother.

54.    Farr knowingly made multiple fraudulent representations, including but not limited to the following:  (a)  on June 17, 2005, Farr emailed Scott Crisler and advised that he had received a response to a Freedom of Information Act (FOIA) request, but Farr had not yet sent any such request;  (b) in July 2005, Farr advised Scott Crisler that he had sent a demand letter to the insurer, but Farr had not yet determined who provided coverage for the shopping center; (c)  on August 19, 2005, Farr emailed Scott Crisler and advised that he was in telephone communications with the potential defendants' liability insurance carrier and that he was preparing a lawsuit, but these statements were not truthful; (d) in November 2005, Farr indicated to Scott Crisler that he had filed a lawsuit and received a general denial of the claim from the defendants, but no such lawsuit had been filed; (e)  in January of 2006, Farr emailed Scott Crisler and advised that depositions were starting in one week, but this representation was not truthful; (f) on February 23, 2006, Farr emailed Scott Crisler and advised that the depositions had gone well and gave plaintiffs an opportunity for summary judgment as to liability, but no lawsuit was pending and no depositions had been taken; (g) on February 24, 2006, Farr emailed Scott Crisler and advised that trial was scheduled for March 27,

which was untrue since no lawsuit had been filed; (h) on April 25, 2006, Farr advised Scott Crisler that the court had granted summary judgment as to liability in favor of the plaintiffs, but in fact no lawsuit had yet been filed; (i) on July 20, 2006, Farr sent a series of emails to Scott Crisler advising of impending mediation; however, there was no scheduled mediation because there was no lawsuit pending; (j) on September 11, 2006, Farr called Scott Crisler and advised that the Crislers had been offered policy limits to settle the claim.  Scott Crisler was relieved and accepted what Mr. Farr knew to be a fictitious settlement offer; (k) on October 13, 2006, Farr wrote Scott Crisler and enclosed a liability Release of All Claims.  The Release sent to Scott Crisler purported to release George C. McIntosh and Langdon S. Flowers, Jr., from any and all claims arising from the incident occurring in Hunter's Mill Shopping Center that resulted in the death of Ginny Crisler.   Scott Crisler, as Executor of the Estate of Ginny Crisler, signed the fraudulent Release of All Claims on October 19, 2006, and returned it to Farr; (l) on November 15, 2006, Scott Crisler received a fabricated document from Farr, which Farr had created using the letterhead of Central Bank, that blamed the delay in wiring the settlement funds on Federal Homeland Security Law;  (m) on November 17, 2006, in an email to Scott Crisler, Farr advised that the total wire of the settlement funds would be $702,427.35, but this was fabricated because no settlement had occurred; (n) on November 21, 2006, Mr. Farr forwarded to Scott Crisler a purported demand letter

- 16 -

addressed to St. Paul Travelers Insurance Company for the "second" one million dollars, but Farr never mailed it to the insurance company; and (o) in connection with sending three wires from the Firm's bank account, which together totaled One Million Dollars, Farr advised Plaintiffs that the money being received was the proceeds from a settlement with the insurance company for the shopping center where their mother was killed.

55.    Farr's false representations were made with the intent to deceive Plaintiffs.  Plaintiffs justifiably relied to their detriment on both the knowingly false representations made by  Farr as aforesaid, and on the Defendant's silences that were intended to mislead the Plaintiffs.  Plaintiffs were induced to act, or refrain from acting, as a result thereof.

56.    As a direct and proximate result of Farr's deliberate, intentional, and fraudulent actions, Plaintiffs were injured and suffered significant damages. Plaintiffs are entitled to damages from Defendant in an amount to be determined by the trier of fact but not less than $550,000, plus interest thereon from the date of loss, general damages as awarded by the trier of fact, punitive damages, and attorney's fees.

## COUNT II

### NONDISCHARGEABILITY OF DEBT BASED UPON
### WILLFUL AND MALICIOUS INJURY
### 11 U.S.C. 523 (a)(6)

57. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 56 above as though fully set forth herein.

58. Defendant's actions were willful, malicious and done without regard to the consequences and damages that would result to Plaintiffs.

59. As a direct and proximate result of Defendant's willful and malicious intent to injure, Plaintiffs suffered significant damages.

60. Plaintiffs are entitled to damages from Defendant in an amount to be determined by the trier of fact but not less than $550,000, plus interest thereon from the date of loss, general damages as awarded by the trier of fact, punitive damages, and attorney's fees.

WHEREFORE, Plaintiffs pray for the following relief:

1) That the Court determine and enter a judgment declaring that the debt owed to Plaintiffs, arising from Defendant's fraud and willful and malicious injury, in an amount to be determined by the trier of fact but not less than $550,000, plus interest thereon, general damages as awarded by the trier of fact, punitive damages, and attorney's fees, is nondischargeable pursuant to 11 U.S.C. §523(a);

2)      That the Plaintiffs have such other and further relief as the Court

deems just and proper.

Respectfully submitted, this 14th day of February, 2011.

FORTSON, BENTLEY AND GRIFFIN, P.A.

By:   /s/ Roy E. Manoll
         Roy E. Manoll
         State Bar No. 469710

By:   /s/ Jeffrey W. DeLoach
         Jeffrey W. DeLoach
         State Bar No. 081669

ATTORNEYS FOR PLAINTIFFS

2500 Daniell's Bridge Road
Building 200, Suite 3A
Athens, Georgia  30606
(706) 548-1151